UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE

KATHLEEN AND BRENT HINSON,

Plaintiffs,

v.                                                        Docket No.

MICROWAVE TECHNIQUES, LLC.

Defendant.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COME the Plaintiffs Kathleen and Brent Hinson (Collectively known as
"Plaintiffs" and individually "Kathleen" and "Brent"), by and through undersigned counsel, and
complains against Defendant Microwave Techniques, LLC ("Defendant") as Defendant:

JURISDICTION AND PARTIES

1.  This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551, *et seq*.,
    the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. § 833, *et seq*., and the False Claims
    Act ("FCA"), 31 U.S.C. §§ 3729, *et seq*.

2.  Kathleen Hinson ("Kathleen") is a United States citizen residing in the City of Nashua,
    County of Hillsborough, State of New Hampshire.

3.  Brent Hinson ("Brent") is a United States citizen residing in the City of Nashua County of
    Hillsborough, State of New Hampshire.

4.  Microwave Techniques, LLC ("Defendant") is a limited liability company with a principal
    place of business in the Town of Gorham, County of Cumberland, State of Maine.

5.  Defendant is an "employer" as that term is defined in the MHRA and WPA.

1

6.    The amount in controversy in this matter exceeds $75,000.

7.    This Court has subject matter jurisdiction over Plaintiffs' federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

8.    On or about May 11, 2021, Plaintiffs filed each of their own timely Complaint of Discrimination against Defendant alleging unlawful whistleblower retaliation with the Maine Human Rights Commission ("MHRC").

9.    On or about April 21, 2022, the MHRC issued a Notice of Right to Sue with respect to Plaintiffs' state law claims.

10.   Plaintiffs have exhausted their administrative remedies with respect to all claims set forth in this Complaint that require administrative exhaustion.

<u>JURY TRIAL REQUESTED</u>

11.   Plaintiffs request a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

12.   Plaintiffs were hired by Ferrite Microwave Techniques, LLC in October 2017.

13.   Kathleen's first job title was Radio Frequency (RF") Engineering Technician. Kathleen later became the Production Control Manager.

14.   Kathleen worked at the Nashua, NH location.

15.   Brent worked at the Nashua, NH location.

16.   Ferrite Microwave Techniques, LLC merged with Mega Industries, LLC in 2020.

17.   The new company is called Microwave Techniques, LLC ("Defendant").

18.   Defendant manufactures a wide line of high-power RF components and systems, including circulators, isolators, loads, rigid waveguides, coaxial components, ultra-high vacuum components and broadcast components.

19.   On March 8, 2020, Kathleen was offered and accepted the position of Inventory Control Coordinator with Defendant at the Gorham, ME location, starting on March 9, 2020.

20.   On March 8, 2020, Brent was offered and accepted the position of RF Engineering Technician with Defendant at the Gorham, ME location, starting on March 9, 2020.

21.   Kathleen's job involved merging inventory of product from the Nashua, NH location to the Gorham, ME location.

22.   Plaintiffs relocated to Maine to accept the positions.

23.   Kathleen's starting pay was $63,018.80 per year.

24.   Brent's starting pay was $65,000 per year.

25.   Defendant promised to pay Plaintiffs' childcare for three years.

26.   After the inventory merger work was completed, around November 5, 2020, Kathleen started working in the lab in Gorham as a RF Engineering Technician. It was a lateral move with no change in pay.

27.   As a RF Engineering Technician, Plaintiffs were responsible for assembly, testing, troubleshooting, tuning, and soldering radio frequency equipment such as but not limited to isolators, circulators, loads, couplers, bi-directional couplers, duplexers, phase shifters, and power combiners/dividers. They were responsible for measuring and recording final test data and creating a testing certificate. They ensured that work travelers were completed and accurate. They supported and facilitated development and implementation of new engineering designs. They assisted in the development and growth of the product design database by ensuring that all relevant test data was correlated to design dimensional data. They consulted with engineering on possible design changes or modifications which may

enhance product performance. They made recommendations to improve processes within the department.

28. Defendant has contracts with the United States Government and with government contractors to produce radio frequency equipment that contains and/or is based on national security secrets.[1]

29. As a condition of those contracts with the United States Government and government contractors, Defendant represents and warrants to the government that it will manufacture and produce radio frequency equipment that contains and/or is based on national security secrets on premises with the necessary and required security clearance.

30. In exchange for producing radio frequency equipment that contains and/or is based on national security secrets on premises with the necessary and required security clearance, Defendant receives payment from the United States Government.

31. Plaintiffs are both U.S. Navy veterans with an active Secret Clearance.

32. Plaintiffs' Secret Clearance permits them to access classified national security information.

33. Plaintiffs had an obligation to report concerns about national security breaches.

34. Donald Paul, Jr. ("Paul") is the son of Donald Paul, Sr., who founded Mega Industries, LLC in 1989.

35. Paul was the lab manager of the Gorham, ME facility.

36. Paul has an active Secret Clearance.

37. However, the Gorham, ME facility did not have Information System Security Clearance ("IS Security Clearance") and was not accredited by the United States Government to conduct classified testing of the radio frequency equipment it builds.

---

[1] Defendant also produced equipment that did not contain and was not based on national security secrets.

38.     Defendant was trying to get IS Security Clearance for the Gorham location.

39.     Having an IS Security Clearance means that the government has determined that a contractor is eligible to work with classified information at that location.

40.     In May 2020, Brent first saw Paul assembling and testing radio frequency equipment ("units") for the Department of Defense ("DOD") and a private government contractor that contained national security secrets at the Gorham, ME facility.

41.     The tests Paul was performing on these units used secret frequencies that could endanger our national security if an enemy learned what they were.

42.     If the secret frequencies Paul used to test the units fell into the hands of an enemy, they could use it to jam communications and missile defense systems.

43.     During the tests that Paul conducted, the frequencies were displayed on an analyzer.

44.     The analyzer Paul used to conduct the tests was labeled "unclassified."

45.     Paul did not seem to care whether or not people in the building who did not have security clearances could observe the frequencies he was using.

46.     Anyone nearby could glance over and see the secret frequencies displayed on the analyzer.

47.     There were 40-60 uncleared people working at the Gorham facility who could have observed Paul conduct the tests and seen the frequencies.

48.     The Nashua, NH facility had a FCL (security) clearance.

49.     Paul was conducting the secret frequency tests in Gorham, ME to save the time and expense of taking the units to Nashua for testing.

50.     Paul's secret frequency tests in Gorham, ME, violated the terms and conditions of its contracts with the United States Government.

51.  Upon information and belief, at the time Defendant entered into contracts with the United States Government, Defendant knew that its promise and representation that it would maintain the necessary and required security clearance at its premises was false at the time those promises and representations were made to the United States Government.

52.  Upon information and belief, Defendant made those false promises and representations in order to entice the United States Government into entering lucrative contracts with Defendant.

53.  Plaintiffs discussed the secret frequency tests that Paul was conducting in Gorham.

54.  Plaintiffs believed and had reasonable cause to believe that it was illegal for Paul to test units using secret frequencies in Gorham, a non-FCL facility and that the testing endangered the health and safety of military personnel and others.

55.  Plaintiffs made many reports that constitute protected activity under the WPA and FCA (hereinafter, "Protected Activity").

56.  Plaintiffs engaged in this activity in order to address the violations of law and to eliminate the threat to the health and safety of service members and others that could result from the illegal testing.

57.  Plaintiffs continued to engage in protected activity.

58.  Beginning in May 2020, Plaintiffs were subjected to a series of retaliatory acts, culminating in the termination of their employment on March 23, 2021 (hereinafter, "Retaliation").

59.  In May 2020, Brent told Paul that testing units using secret frequencies in Gorham was wrong and illegal.

60.  Brent's report to Paul was Protected Activity for purposes of the WPA and FCA.

61.    Paul did not listen to Brent and continued to test units using secret frequencies (hereinafter, "illegal tests") in Gorham.

62.    In June 2020, Brent spoke to FSO Paul Alton ("Alton") in person and reported that Paul was conducting illegal tests.

63.    Brent's report to Alton was Protected Activity for purposes of the WPA and FCA.

64.    Plaintiffs continued to engage in Protected Activity.

65.    Alton told Brent that Defendant's contract with the DOD included provisions that Defendant was required to comply with security protocols and protect the secrecy of the frequencies.[2]

66.    Alton asked Brent to keep records about what Paul was doing that was illegal, how often, where, and who was around when he conducted the tests.

67.    Brent also reported that Paul was doing illegal tests to Peter Tibbets ("Tibbets"), CEO at the time. He made the report in person.

68.    Brent's report to Tibbets was Protected Activity for purposes of the WPA and FCA.

69.    Plaintiffs continued to engage in Protected Activity.

70.    During June and July 2020, Brent continued to engage in Protected Activity by reporting to Alton concerns about Paul's illegal testing. He reported his concerns via text messages, phone calls, and in person.

71.    In July 2020, Alton was transferred to another position where he would not have responsibility for the secret tests that Paul was conducting in Gorham.

72.    Alton encouraged Plaintiffs to keep expressing their concerns and to bring them to the Department of Defense ("DOD") if the problem was not resolved internally.

73.    Paul told Plaintiffs that Alton was replaced as FSO by Walter Wunderlich ("Wunderlich").

---

[2] This was something that the Plaintiffs were aware of, but Mr. Alton verified it.

74.     Paul's statement to Plaintiffs that Alton was replaced as FSO by Wunderlich was false.

75.     In fact, Alton remained the FSO of Defendant.

76.     Paul lied to Plaintiffs because he harbored retaliatory animus towards Plaintiffs and sought to continue his illegal tests.

77.     Plaintiffs continued to engage in protected activity.

78.     In July or August 2020, Paul asked Brent to participate in illegal testing at the Gorham, ME facility.

79.     Paul also asked Brent to stop reporting him to the FSOs.

80.     Paul continued to ask Brent to participate in illegal testing and to stop Brent's ongoing reporting of the FSOs every so often between July/August 2020 and November/December 2020.

81.     Brent opposed Paul's illegal conduct and did not agree to perform illegal tests and did not promise to stop reporting what Paul was doing was illegal.

82.     For the next several months, Brent kept track of the illegal tests that Paul conducted, how often, where, and who was around as instructed by Alton before he was removed from his position.

83.     Upon information and belief, Defendant did not investigate Plaintiffs' protected reports.

84.     On November 5, 2020, Kathleen moved from the Inventory Control Coordinator position to the role of RF Engineering Technician.

85.     In January/February 2021, Paul engaged in retaliation by harassing Plaintiffs.

86.     Kathleen reported Paul's harassment to Diana Wilson, HR Director ("Wilson"). Her first reports were by telephone.

87.     Kathleen's reports to Wilson were Protected Activity for purposes of the WPA and FCA.

88.   Plaintiffs continued to engage in Protected Activity.

89.   In mid-February 2021, Kathleen reported to Wilson that Paul was continuing to conduct illegal tests and that it needed to be corrected.

90.   Kathleen's reports to Wilson and Paul were Protected Activity for purposes of the WPA and FCA.

91.   Wilson assured Kathleen that Tibbets was working with an owner, Peter Anania ("Anania"), to correct the problem. Wilson told Kathleen that she knew that illegal testing could result in serious legal action and the loss of orders.

92.   Paul did not stop illegal testing in Gorham.

93.   In fact, during February 2021, Plaintiffs observed that Paul increased how often he conducted illegal tests.

94.   Plaintiffs also observed that Paul put less effort into protecting the secrecy of the frequencies he was using.

95.   In February 2021, Plaintiffs' children's daycare shut down for two weeks due to COVID-19.

96.   Paul confronted Kathleen outside the cafe area and told her that she should really be staying home to care for her children, and not working, instead of having to leave work at times when they needed care.

97.   During February 2021, Plaintiffs called the DOD hotline to report that leadership at Defendant was not doing anything to stop illegal testing.

98.   On February 11, 2021, Wilson met with Plaintiffs and issued "Employee Improvement Plans" to both Kathleen and Brent.

99.   Plaintiffs told Wilson that this was retaliation for reporting that Paul was conducting illegal tests.

100.   Plaintiffs' report to Wilson was Protected Activity for purposes of the WPA and FCA.

101.   Plaintiffs asked why Defendant skipped the step of issuing a verbal warning. Wilson said that

Anania and Chief Technology Officer Henry Downs ("Downs") felt this needed to be a

written warning instead.

102.   Plaintiffs told Wilson that the allegations in the EIP about them were false.

    a.   Plaintiffs did not make negative remarks regarding other employees, managers or the

company, as alleged.

    b.   Plaintiffs did not argue with each other during work time in work area about personal

matters. Plaintiffs debated theories and ideas to make the unit work, like other co-

workers did.

    c.   Plaintiffs were accused of discussing personal work agreements, compensation, and

other aspects of employment at work. Plaintiffs did not discuss these issues at work.

Even if Plaintiffs did, employers may not prohibit employees from discussing

compensation according to the National Labor Relations Board.  In addition, Maine

law forbids an employer from prohibiting employees from disclosing and discussing

wages with another and therefore this EIP violated 26 M.R.S. §628.

    d.   Plaintiffs were accused of leaving the work area for an extended period of time,

which was an unfounded perception only, and untrue.

103.   Wilson told Kathleen that although she did not agree with the allegations in the EIP, she had

to notify the Plaintiffs about the warning.

104.   Plaintiffs talked to Wilson again about the illegal testing and how it is still a problem; she

just said that "they are working on it."

105.   Wilson encouraged Plaintiffs to write out their disagreements with the allegations against them that were untrue. Plaintiffs submitted a written rebuttal to the EIP.

106.   After Plaintiffs received EIPs, Paul told Plaintiffs that a manager, Mike Ballard ("Ballard"), had complained about them taking a long break.

107.   Plaintiffs spoke to Ballard and found out that Paul lied. Plaintiffs reported this to Wilson and to Nathan Veilleux ("Veilleux"), who was Paul's boss.

108.   Paul told Brent that he had had enough of Kathleen and would get her fired. Brent told Paul that Kathleen was not wrong to stand up for herself when he lied and was disrespectful toward Kathleen.

109.   Kathleen had another meeting with Wilson to discuss the escalation of Paul's harassment. Wilson said that he had a history of this type of conduct and that she would do her best to handle it.

110.   In February 2021, Kathleen reported that Paul was doing illegal testing to the new FSO, Wunderlich.

111.   Kathleen's report to Wunderlich was Protected Activity for purposes of the WPA and FCA.

112.    Wunderlich told Kathleen, "That is not happening. You are wrong. We don't do secret testing here." He then walked through the lab, watched as Paul conducted an illegal test, said nothing to him about it, and left.

113.   In February / March 2021, Plaintiffs observed Paul continue to conduct illegal tests. Plaintiffs saw CTO Downs come by to check on Paul's work to see if he was getting the units done. Veilleux came by to talk to Paul while he was doing the illegal testing.

114.   Plaintiffs were very disturbed that Defendant's managers was fully aware of the illegal testing and did not make it stop.

115. Separately, Plaintiffs called the DOD hotline and reported that leadership was not doing anything about illegal testing. Plaintiffs were both told to file an online complaint.

116. On March 3, 2021, Plaintiffs filed an online complaint with the DOD.

117. Plaintiffs' online complaint with the DOD is protected activity for purposes of the WPA and FCA.

118. Plaintiffs continued to engage in protected activity.

119. During March 2021, Paul was conducting illegal tests more and more often. Paul grew increasingly careless and would leave the secret frequencies displayed on the analyzer and walk away for hours without securing the information.

120. Plaintiffs called the DOD hotline again, on speakerphone, and made another report.

121. Plaintiffs phone calls to the DOD constituted Protected Activity for purposes of the WPA and FCA.

122. The following week, the same thing happened and Plaintiffs made yet another complaint, on speakerphone, to the DOD hotline.

123. Brent also called the FBI to report their concerns.

124. Brent's reports to the DOD and FBI constituted Protected Activity for purposes of the WPA and FCA.

125. On March 17, 2021, Plaintiffs received performance reviews from Veilleux. Plaintiffs were rated as Outstanding, Excellent, or Fully Satisfactory in all categories. Plaintiffs were not rated as Needs Improvement or Unsatisfactory in any category. Plaintiffs were not marked as having issues with other co-workers.

126. Veilleux told Plaintiffs that Paul was not going anywhere and that they would have to deal with him and his outrageous behavior.

127.   Veilleux said that Paul had a history of getting rid of employees who challenged him.

128.   Paul continued to harass and mistreat Plaintiffs.

129.   Upon information and belief, Paul learned that someone had made a report about the illegal tests to a public body and thought it was Plaintiffs.

130.   These events all happened on the morning of Friday, March 19, 2021:

    a.   Background: On Thursday, March 18, Paul was not in the lab. The project Kathleen was working (CI3-18) on was stuck. Kathleen obtained permission from Veilleux to give the RMA a quick look. Kathleen performed a five minute evaluation on the RMA. Once the evaluation was completed, Kathleen went directly back to her stuck project.

    b.   The morning of March 19, Paul yelled at Kathleen for evaluating the RMA the previous day.

    c.   Kathleen went to ask Veilleux if she was wrong to pause her stuck project to get an RMA moving.

    d.   Paul followed Kathleen into Veilleux's office, cut her off when she asked to meet with Veilleux alone, and said he needed to be there. Kathleen said she would prefer to meet with Veilleux alone, and he refused. Kathleen asked if she could meet with Wilson. Instead, he insisted on involving CTO Downs in the conversation and moved the meeting into a conference room.

    e.   The meeting concluded with Kathleen being told that she just had to deal with Paul's conduct because he was too valuable to go anywhere.

    f.   At 10:06am, Kathleen wrote an email to Diana Wilson, V.P. of Human Resources and Safety in NH.

      i.      Kathleen reported that Paul was harassing and disrespecting her; that he had lied about her, lied to her, screamed at her, swore at her, disrespected her, and refused her the right to report things to senior leadership.

      ii.     She reported again that she was seeing Paul breaking federal law on a weekly basis by illegally testing secret units and exposing secret information out in the open.

    g.     Paul continued to mistreat Kathleen. He cut her off while she was talking, and walked away. She reported his abusive behavior to Wilson by email at 11:55am.

131.   Kathleen's reports constitute Protected Activity for purposes of the WPA and FCA.

132.   Plaintiffs continued to engage in protected activity.

133.   These events happened on the afternoon of Friday, March 19, 2021:

    a.     At about 1:45pm, Paul started yelling at Kathleen about doing a math equation, trying to figure out the best way to get her unit to work. He said Kathleen was wasting company time, even though Veilleux was aware of what she was doing and was helping her solve the problem through email.

    b.     Paul said that he knew Plaintiffs were the ones who reported him to the DOD and FBI and that he knew he was being investigated. He was screaming and swearing.  He said Plaintiffs needed to stop calling HR. He said that HR was not going to protect the Plaintiffs from him.

    c.     At about 1:55pm, Paul chased Kathleen in the lab and accused her of not working. In fact, she was soaking out the CI3-18 per his instruction and trying to figure out the best way to bond it and where to bond it.

    d.     Brent stood up for Kathleen and tried to protect her from Paul

     e.    Kathleen called Wilson during Paul's outburst.

     f.    Kathleen told Wilson that Paul threatened Plaintiffs and told them to "Stop calling HR. HR won't protect you." "I have been here 28 years and I ain't going anywhere."

     g.    Paul told Plaintiffs to go home – to get out of there for the rest of the day.

     h.    Wilson advised Plaintiffs to leave for the day and said that she would be in touch.

134.   On Sunday, March 21, 2021, Wilson emailed and asked to meet Plaintiffs at a café in Westbrook.

135.   On Monday, March 22, 2021, an FBI Special Agent and an NCIS agent came to Plaintiffs' home to get information about the illegal testing.

136.   Plaintiffs submitted a Reprisal Complaint to the DOD Office of the Inspector General.

137.   Plaintiffs Reprisal Complaint to the DOD Office of the Inspector General constitutes Protected Activity for purposes of the WPA and FCA.

138.   Defendant harbored retaliatory animus towards Plaintiffs because of their protected activity.

139.   On Tuesday, March 23, 2021, Wilson met with Plaintiffs at a café and terminated them.

140.   Wilson told Plaintiffs that they were being terminated for cause.

141.   Wilson stated that the argument on March 19, 2021 and the prior performance issues were the cause for termination.

142.   Wilson told Plaintiffs that they could not return to the property to retrieve their belongings.

143.   Wilson stated that what Defendant was doing to Plaintiffs was "horrible."

144.   Wilson confirmed that she was aware of Plaintiffs protected activity.

145.   Wilson stated that she had told Anania and Wunderlich that Plaintiffs had reported to the FBI that Paul was conducting illegal tests.

146.   Wilson indicated that "they" were the ones who decided to terminate Plaintiffs.

147. Wilson told Plaintiffs that they could not go back to the Gorham facility because of the FBI investigation into illegal testing there.

148. Instead of addressing and remedying the concerns detailed in Plaintiffs' protected reports, Defendant fabricated pretext to terminate Plaintiffs.

149. Wilson wrote a letter dated March 23, 2021 stating the (alleged) reasons for termination:

"We have made the difficult decision to end your employment. The reasons for this decision include the recent argument with your Supervisor on March 19, 2021, along with previous performance concerns discussed with you on February 11, 2021 that included making negative comments regarding other employees, managers, the company and arguing with your spouse at work (see attached copy of Employee Performance Improvement form). We believe for all these reasons that it is in the best interest of everyone that we end your employment…"

150. Plaintiffs were not terminated for the reasons stated in Wilson's March 23, 2021 letter.

151. Plaintiffs were fired due to whistleblower retaliation.

152. Plaintiffs reported their employer to the DOD, NCIS, and FBI for what they had reasonable cause to believe was multiple violations of laws protecting national security secrets including but not limited to the 1947 National Security Act.

153. Plaintiffs engaged in the following Protected Activity.

   a. In May 2020, Brent reported orally to Paul that testing DOD units using secret frequencies at the Gorham facility was wrong and illegal.

   b. On or around May or June 2020, Brent reported orally to Alton and to Tibbetts that Paul was conducting illegal tests.

    c.    During June and July 2020, Brent continued to report to Alton concerns about Paul's illegal testing. He reported his concerns via text messages, phone calls, and in person. For example, on July 10, 2020, Brent texted Alton and reported that illegal tests were being conducted in Gorham.

    d.    In July and August 2020, Paul asked Brent to participate in illegal testing at the Gorham facility. Brent refused and opposed Paul's request to violate the law.

    e.    In February 2021, Kathleen witnessed Paul engaging in illegal testing and reported Paul's illegal testing to Wunderlich.

    f.    In February 2021, Plaintiffs called the DOD hotline to report that leadership at Defendant was not doing anything to stop illegal testing.

    g.    On February 11, 2021, Plaintiffs reported orally to Wilson that illegal testing was occurring at the Gorham facility.

    h.    In February and March 2021, Plaintiffs called the DOD hotline and reported Defendant's illegal testing. Plaintiffs filed online complaints with the DOD. Brent called the FBI to report the illegal testing. The FBI and NCIS were called in to investigate the Hinsons' reported concerns.

    i.    On March 19, 2021, Kathleen reported in writing to Wilson that she sees Paul breaking federal law on a weekly basis by conducting illegal tests. That evening, Kathleen again reported in writing to Wilson that Paul was engaging in illegal testing.

154.    Defendant's testing and careless disclosure of classified frequencies in Gorham, ME violated the law and also endangered the health and safety of military personnel and others and Plaintiffs reasonably believed that Defendant's actions violated the law and endangered the health and safety of military personnel and others.

155. In addition to engaging in protected activity under the WPA, Plaintiffs also believed that Defendant's testing and careless disclosure of classified frequencies in Gorham, ME violated Defendant's contracts with the government and subcontractors.

156. Defendant had contracts with the United States Government to produce radio frequency equipment that contains and/or is based on national security secrets on premises.

157. In exchange for producing radio frequency equipment that contains and/or is based on national security secrets on its premises with the required and necessary security clearance, Defendant received payment from the United States Government.

158. Plaintiffs believed that Defendant was defrauding the United States Government by billing and taking payment from the United States Government but failing to provide what was promised, namely compliance with the contractual requirements to protect classified frequencies.

159. Plaintiffs cannot identify all of the false claims for payment that were caused by Defendant's conduct. The false claims were presented by Defendant's employees and agents, and Plaintiffs did not and do not have access to the records of all such false or fraudulent statements, records, or claims.

160. Defendant knew at the time its promises and representations were made to the United States Government that it would produce radio frequency equipment that contains and/or is based on national security secrets that those promises were false.

161. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

162.  By virtue of the facts described above, Defendant knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the United States Government.

163.  The United States Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's false statements and illegal conduct.

164.  By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount.

165.  Defendant knew Plaintiffs' actions could reasonably lead to a FCA and *qui tam* action.

166.  Plaintiffs' reports were made in good faith. The goal of their reports was to stop Defendant from conducting illegal tests and to protect national security and the safety of military personnel and others and to stop Defendant's defrauding the United States Government by failing to provide what was promised in its contracts.

167.  Defendant terminated Plaintiffs because of their Protected Activity.

168.  In addition, Defendant admittedly terminated them, in part, for discussing Plaintiffs' compensation, which violates 26 M.R.S. §628.

<u>COUNT I: MHRA and WPA</u>

169.  Paragraphs 1 – 168 are incorporated by reference.

170.  The MHRA makes it unlawful for an employer to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment because of previous actions that are protected under the WPA.

171.   The WPA makes it unlawful for an employer to discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee, acting in good faith, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of Maine or the United States.

172.   The MHRA makes it unlawful for any person to discriminate against any individual for engaging in protected activity as set out in §4633.

173.   Defendant's conduct violates the MHRA and WPA.

COUNT II: FCA Retaliation

174.   Paragraphs 1 – 173 are incorporated by reference.

175.   The anti-retaliation provisions of the FCA make it unlawful to discharge, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of lawful acts done by the employee in an effort to stop a violation of the FCA.

176.   Defendant's conduct violates the FCA.

PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A.      Declare the conduct engaged in by Defendant to be in violation of their rights;

B.      Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate their rights;

C.      Order Defendant to reinstate Plaintiffs or award front pay to Plaintiffs;

D.      Award lost future earnings to compensate Plaintiffs for the diminution in expected earnings caused by Defendant's retaliation;

E.      Award equitable-relief for back pay, benefits and prejudgment interest;

F.      Award compensatory damages in an amount to be determined at trial;

G.      Award punitive damages in an amount to be determined at trial;

H.      Award liquidated damages in an amount to be determined at trial;

I.      Award nominal damages;

J.      Award attorney's fees, including legal expenses, and costs;

K.      Award prejudgment interest;

L.      Permanently enjoin Defendant from engaging in any employment practices that violate the MHRA, WPA and/or FCA;

M.      Require the CEOs of Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate retaliation in the future;

N.      Require that Defendant post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

O.      Require that Defendant train all management level employees on the protections afforded by the MHRA, WPA and FCA;

P.      Require that Defendant place a document in Plaintiffs' personnel files which explains that Defendant unlawfully terminated them because of retaliation; and

Q.      Grant to Plaintiffs such other and further relief as may be just and proper.


Dated: April 25, 2022                    /s/ Chad T. Hansen
                                         Chad T. Hansen
                                         Martin P. Tartre
                                         Attorneys for the Plaintiff

EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343

chad@employeerightslaw.attorney
martin@employeerightslaw.attorney