## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| **KATHLEEN AND** | ) | |
| **BRENT HINSON,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **No. 2:22-cv-00114-JDL** |
| | ) | |
| **MICROWAVE** | ) | |
| **TECHNIQUES, LLC,** | ) | |
| | ) | |
| **Defendant** | ) | |

### RECOMMENDED DECISION ON MOTION TO DISMISS

Microwave Techniques, LLC, moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the sole federal claim pressed by its former employees Kathleen and Brent Hinson: that Microwave retaliated against them for whistleblowing activity protected by the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733. *See* Defendant's Motion to Dismiss ("Motion") (ECF No. 8) at 8-14; Complaint (ECF No. 1) ¶¶ 174-76. Microwave asserts, and with the benefit of oral argument I agree, that the Hinsons' alleged whistleblowing activities fall outside the scope of conduct protected by the FCA. Accordingly, I recommend that the Motion be granted, the Hinsons' FCA claim be dismissed, and the Court decline to exercise supplemental jurisdiction over the Hinsons' remaining state-law claims.

### I. Factual Background

A court reviewing a motion to dismiss for failure to state a claim must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable

inferences therefrom in the pleader's favor." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 52-53 (1st Cir. 2013) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)).   In so doing, courts apply a "two-pronged approach," *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011), first "isolat[ing] and ignor[ing] statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," and, second, taking the complaint's well-pleaded "(i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief," *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).

The Hinsons allege the following well-pleaded facts.

The Hinsons were hired by Ferrite Microwave Techniques, LLC, in October 2017 and worked at its Nashua, New Hampshire, location.   Complaint ¶¶ 12, 14-15. In 2020, Ferrite merged with Mega Industries, LLC, forming Microwave, which manufactures a wide line of high-power Radio Frequency (RF) components and systems.   *Id*. ¶¶ 16-18.   In March 2020 the Hinsons accepted jobs at Microwave's Gorham, Maine, location.   *Id*. ¶¶ 19-20.   Brent was hired as an RF Engineering Technician and Kathleen initially as Inventory Control Coordinator and then as an RF Engineering Technician in November 2020.   *Id*. ¶¶ 19-20, 26.

The Hinsons are United States Navy veterans with active secret clearances that permit them to access classified national security information, and both had an obligation to report concerns about national security breaches.   *Id*. ¶¶ 31-33.   Donald

2

Paul, Jr., the lab manager of the Gorham facility, had an active secret clearance, but the Gorham facility did not have an Information System (IS) Security Clearance and was not accredited by the Government to conduct classified testing of the RF equipment it builds. *Id.* ¶¶ 34-37. Microwave was trying to obtain an IS Security Clearance—which the Government awards when a contractor is eligible to work with classified information—for the Gorham location. *Id.* ¶¶ 38-39.

In May 2020, Brent first saw Paul assembling and testing RF units containing national secrets for the United States Department of Defense (DOD) and a private Government contractor. *Id.* ¶ 40. During Paul's testing, secret frequencies were displayed on an analyzer labeled "unclassified." *Id.* ¶¶ 41, 43-44. If intercepted by an enemy, such secret frequencies could be used to jam communications and missile defense systems, endangering national security. *Id.* ¶¶ 41-42. Paul did not seem to care whether the forty to sixty people in the Gorham facility who did not have security clearances could observe those frequencies, which anyone nearby could see displayed on the analyzer. *Id.* ¶¶ 45-47. Paul was conducting the secret frequency tests in Gorham to save the time and expense of taking the units to the Nashua facility, which had the proper security clearance. *Id.* ¶¶ 48-49.

The Hinsons believed Paul's tests using secret frequencies in Gorham without the necessary security clearance were illegal and endangered the health and safety of military personnel and others. *Id.* ¶¶ 53-54. They began making a series of reports to address the violations of law and eliminate the threat to the health and safety of service members and others posed by the illegal testing. *Id.* ¶¶ 55-56.

In May 2020, Brent told Paul that testing units using secret frequencies in Gorham was wrong and illegal, but Paul continued to do so. *Id*. ¶¶ 59, 61. In June 2020, Brent reported to Facility Security Officer Paul Alton that Paul was conducting illegal tests. *Id*. ¶ 62. The Hinsons were aware, and Alton verified to Brent, that Microwave's contract with the DOD included provisions that Microwave was required to comply with security protocols and protect the secrecy of the frequencies. *Id*. ¶ 65. Alton asked Brent to keep records about what Paul was doing that was illegal, how often, where, and who was around when he conducted the tests. *Id*. ¶ 66.

Brent also reported to Peter Tibbets, then Chief Executive Officer of Microwave, that Paul was conducting illegal tests. *Id*. ¶ 67. During June and July 2020, Brent continued to report his concerns about illegal testing to Alton. *Id*. ¶ 70. In July 2020, Alton was transferred to another position in which he would not have responsibility for the secret tests Paul was conducting in Gorham. *Id*. ¶ 71. Alton encouraged the Hinsons to keep expressing their concerns and bring them to the DOD if the problem was not resolved internally. *Id*. ¶ 72. Paul falsely told the Hinsons that Alton was replaced as facility security officer by Walter Wunderlich, although Alton actually remained in the position. *Id*. ¶¶ 73-75.

Every so often between July/August and November/December 2020, Paul asked Brent to participate in illegal testing at the Gorham facility and to stop reporting him to the facility security officers. *Id*. ¶¶ 78-80. Brent opposed Paul's illegal conduct and did not agree to perform illegal tests or promise to stop reporting that what Paul was doing was illegal. *Id*. ¶ 81. For the next several months, as

instructed by Alton, Brent kept track of how often and where Paul conducted illegal tests and who was around at those times.  *Id*. ¶ 82.

In early 2021, Paul began harassing the Hinsons, and Kathleen reported the harassment to Human Resources (HR) Director Diana Wilson.  *Id*. ¶¶ 85-86.  In mid-February 2021, Kathleen reported to Wilson that Paul was continuing to conduct illegal tests and that it needed to stop.  *Id*. ¶ 89.  Wilson assured Kathleen that Tibbets was working with an owner, Peter Anania, to correct the problem.  *Id*. ¶ 91. Wilson told Kathleen that she knew that illegal testing could result in serious legal action and the loss of orders.  *Id*.  Paul did not stop illegal testing in Gorham; in fact, during February 2021, he increased it and put less effort into protecting the secrecy of the frequencies he was using.  *Id*. ¶¶ 92-94.  In February 2021, the Hinsons called the DOD hotline to report that Microwave's leadership was not doing anything to stop illegal testing.  *Id*. ¶ 97.

On February 11, 2021, Wilson met with the Hinsons and issued an employee improvement plan to each of them.  *Id*. ¶ 98.  The Hinsons told Wilson that this constituted retaliation for reporting that Paul was conducting illegal tests and that the allegations in the improvement plans were false.  *Id*. ¶¶ 99, 102.  The Hinsons again raised the issue of illegal testing, informing Wilson that it was still a problem. *Id*. ¶ 104.  She responded, "they are working on it."  *Id*.

In February 2021, Kathleen reported to the new facility security officer, Wunderlich, that Paul was doing illegal testing.  *Id*. ¶ 110.  Wunderlich told her, "That is not happening.  You are wrong.  We don't do secret testing here."  *Id*. ¶ 112.

He then walked through the lab, watched as Paul conducted an illegal test, said nothing to him about it, and left. *Id.* In February/March 2021, the Hinsons saw Chief Technology Officer Henry Downs come by to check on Paul's work and Paul's boss Nathan Veilleux come by to talk to Paul while he was doing the illegal testing. *Id.* ¶113; *see also id.* ¶¶ 103, 107. The Hinsons were very disturbed that Microwave's managers were fully aware of the illegal testing and did not make it stop. *Id.* ¶ 114. Separately, the Hinsons called the DOD hotline and reported that leadership was not doing anything about the illegal testing. *Id.* ¶ 115. They were both told to file an online complaint, which they did on March 3, 2021. *Id.* ¶¶ 115-16. During March 2021, Paul was conducting illegal tests more and more often. *Id.* ¶ 119. He grew increasingly careless and would leave the secret frequencies displayed on the analyzer and walk away for hours without securing the information. *Id.* The Hinsons called the DOD hotline again and made another report. *Id.* ¶ 121. The following week the same thing happened, and the Hinsons made yet another complaint to the DOD hotline. *Id.* ¶ 122. Brent also called the FBI to report their concerns. *Id.* ¶ 123.

Paul continued to harass and mistreat the Hinsons. *Id.* ¶ 128. On the morning of March 19, 2021, Kathleen reported to Wilson that she had seen Paul break federal law on a weekly basis by illegally testing secret units and exposing secret information in the open. *Id.* ¶ 130(f)(ii). That afternoon, Paul began yelling at Kathleen about a math equation and, screaming and swearing, said that he knew the Hinsons had reported him to the DOD and FBI and knew he was being investigated.

*Id.* ¶¶ 133(a)-(b). Paul told the Hinsons to go home, and Wilson advised them to leave for the day and said she would be in touch. *Id.* ¶¶ 133(g)-(h).

On March 22, 2021, Government agents came to the Hinsons' home to get information about the illegal testing. *Id.* ¶ 135. The Hinsons submitted a Reprisal Complaint to the DOD Office of the Inspector General. *Id.* ¶ 136. The following day, Wilson met with the Hinsons at a café and terminated their employment, purportedly for cause. *Id.* ¶¶ 139-41.

The Hinsons reported to the DOD, NCIS, and FBI what they had reasonable cause to believe were multiple violations by Microwave of laws protecting national security secrets, including but not limited to the 1947 National Security Act. *Id.* ¶ 152. The Hinsons' reports were made in good faith, with the goal of stopping Microwave from conducting illegal tests, protecting national security and the safety of military personnel and others, and stopping Microwave from defrauding the Government by failing to provide what was promised in its contracts. *Id.* ¶ 166.

## II. Discussion

"To prevail on an FCA retaliation claim, a plaintiff must show that 1) the employee's conduct was protected under the FCA; 2) the employer knew that the employee was engaged in such conduct; and 3) the employer discharged or discriminated against the employee because of his or her protected conduct." *Guilfoile v. Shields*, 913 F.3d 178, 187-88 (1st Cir. 2019) (cleaned up). "A plaintiff must sufficiently plead that he or she was retaliated against based on conduct that reasonably could lead to a viable FCA action." *Id.* at 188 (cleaned up).

"The kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 238 (1st Cir. 2004) (cleaned up). "What the employer must know is that the plaintiff is engaged in protected conduct, that is, investigation or other activity concerning false or fraudulent claims that the employer knowingly presented to the federal government." *Id*. at 239. "Where an employee has not engaged in conduct protected under the FCA, he cannot meet the second and third elements of an FCA retaliation claim, as those depend upon the first." *Id*. at 237 n.22.

Microwave contends that the Hinsons did not engage in protected conduct because their investigations and reports concerned alleged illegal activities, not false claims. *See* Motion at 12; Defendant's Reply (ECF No. 11) at 3, 7. The Hinsons counter that their reports and investigations reasonably could have led to a viable FCA action because the illegal activity of which they complained constituted a material breach of Microwave's contracts with the Government, resulting in the knowing submission of false claims. *See* Plaintiff's Opposition (ECF No. 10) at 11-12, 15-18. However, the Hinsons do not forge a sufficient link between their conduct and the submission of any false claim to sustain their FCA retaliation action, warranting its dismissal.

An employee "need not have *known* that his actions could lead to a qui tam suit under the FCA, or even that a False Claims Act existed, in order to demonstrate that he engaged in protected conduct." *Karvelas,* 360 F.3d at 237. "However, conduct protected by the FCA is limited to activities that 'reasonably could lead' to an FCA

action; in other words, investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *Id.* In turn, as the First Circuit has construed this standard, the link between an employee's activities and an employer's submission of false or fraudulent claims must be purposeful, not coincidental.

The First Circuit has held, for example, that employees engaged in protected conduct when a hospital employee allegedly "was investigating and reporting the hospital's fraudulent billing practices rather than merely its noncompliance with state or federal regulations," *Karvelas*, *id.* at 238,[1] and a pharmaceutical company manager allegedly reported to his employers that they were violating the federal Anti-Kickback Statute (AKS) by paying a consultant for every successful referral of a hospital, *see Guilfoile*, 913 F.3d at 191-92.[2]

By contrast, the First Circuit determined that employees had not engaged in protected conduct when a hospital employee complained not only about patient-care problems such as inadequate staffing but also a "failure to meet regulatory standards which are required for reimbursement by Medicare and Medicaid," *Karvelas*, 360 F.3d at 237 (cleaned up), and a pharmaceutical company employee had adduced evidence on summary judgment that he had "objected to or reported receipt of instructions to

---

[1] Specifically, the employee allegedly complained to the hospital that his supervisor had directed him "to complete patient evaluations" billed to Medicare and Medicaid at $150 each "even if the patients had been discharged or had died" and that the hospital had "filed claims that were based on codes that the [hospital] knew would result in greater payments than what an appropriate code would have provided." *Karvelas*, 360 F.3d at 237-38.

[2] The AKS "criminalizes, in relevant part, the knowing and willful offer or payment of any remuneration (including any kickback, bribe, or rebate) to induce a person to recommend ordering any service for which payment may be made in whole or in part under a federal health care program." *Guilfoile*, 913 F.3d at 188-89 (cleaned up).

promote a drug's off-label use" without any evidence "that those objections or reports concerned FCA-violating activity such as the submission of false claims," *United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 60 (1st Cir. 2017).

The Hinsons' activities fall on the unprotected side of this divide.  As Microwave underscores, *see* Reply at 3, the Hinsons do not allege that they investigated or reported fraud on the Government or false billing.  Rather, they allege that they investigated and repeatedly reported what they believed to be the illegal and dangerous practice of testing RF equipment containing national security secrets without either the required Government security clearance or due care to safeguard those secrets.

The Hinsons attempt to forge the necessary link to protected conduct by positing that the illegal testing of which they complained could form the basis for an FCA action under an "implied false certification" theory of liability.  *See* Opposition at 10-12.  Pursuant to that theory, the FCA is violated "when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement" in circumstances in which "the omission renders those representations misleading." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016).

However, the Hinsons do not allege that they ever investigated or reported any claims or payments made pursuant to Microwave's alleged Government contracts, and the allegations on which they rely to underpin their implied false certification

10

theory are either conclusory or describe their intentions and beliefs, not their activities.[3]  Indeed, they admit that they have no knowledge of any particular claims Microwave submitted to the Government.  *See* Complaint ¶ 159.

The Hinsons liken their case to *Jewell v. Lincare, Inc.*, 810 F. Supp. 2d 340 (D. Me. 2011), and *Manfield v. Alutiiq International Solutions, Inc.*, 851 F. Supp. 2d 196 (D. Me. 2012), in which this Court held complaints sufficient to state claims for FCA retaliation.  *See* Opposition at 13-16.  However, *Jewell* and *Manfield* are distinguishable.

The employee in *Jewell*, whose employer provided health-care equipment and services, reported to his manager that another employee was forging client signatures on, and backdating, documents.  *See Jewell*, 810 F. Supp. 2d at 342.  The employee had not expressly mentioned fraudulent billing, *see id.* at 343; however, the documents at issue "were submitted to Medicare and Mainecare (Medicaid) in connection with [his employer's] requests for reimbursement for equipment and services," *id.* at 342.  Accordingly, this Court held, the employee's report "concerned [his employer's] fraudulent billing practices—i.e. backdating and forging client

---

[3] *See, e.g.,* Complaint ¶ 28 (Microwave has contracts with both the United States Government and Government contractors to produce RF equipment that contains and/or is based on national security secrets); *id.* ¶ 29 (as a condition of those contracts, Microwave warrants that it will manufacture the RF equipment with the necessary and required security clearance), *id.* ¶ 50 (Paul's secret frequency tests in Gorham violated those contracts); *id.* ¶¶ 51-52 (Microwave knowingly made those false representations to entice the Government to enter into lucrative contracts); *id.* ¶ 158 (the Hinsons believed Microwave was defrauding the Government by billing and taking payment from the Government but failing to provide what was promised, namely compliance with the contractual requirements to protect classified frequencies); *id.* ¶ 163 (the Government, unaware of the falsity of Microwave's records, statements, and claims, paid and continues to pay claims that would not be paid but for Microwave's false statements and illegal conduct); *id.* ¶ 166 (the Hinsons intended not only to stop the illegal tests and protect national security and the safety of military personnel and others but also to stop Microwave from defrauding the Government).

signatures on documents that were submitted to the government for reimbursement." *Id.* at 344 (cleaned up).  In this case, by contrast, the Hinsons do not allege that they ever investigated or reported any billing or claims practice of Microwave.

In *Manfield*, this Court held that an employee stated a claim for FCA retaliation when he had complained to his employers that their failure to provide certain types of ammunition and holsters breached their contract with the Navy.  *See Manfield*, 851 F. Supp. 2d at 203-04.  The Court reasoned that, although the employee's reports "did not involve any direct observations of forged or falsified billing to the federal government," and the employee had not alleged "how the Defendants are paid by the Navy for security services," a "contract itself constitutes a claim for payment, insofar as it recites the obligations of each party to one another." *Id.* at 203.  The Court, accordingly, concluded that because the employee had alleged that "the contract requires that ball ammunition and double retention holsters be provided," his reports might "concern FCA violations."  *Id.*

The Hinsons do not allege that they either investigated or reported any issues concerning Microwave's contracts.  However, even if they had, their reliance on *Manfield* would be misplaced.  As the United States District Court for the District of New Hampshire recognized, *Manfield* "was handed down before the Supreme Court's decision in *Escobar*, in which the Court clarified the meaning of 'false or fraudulent claims' under the FCA[.]"  *Chalifoux v. BAE Sys., Inc.*, No. 20-cv-401-PB, 2021 WL 54171, at *4 n.2 (D.N.H. Jan. 6, 2021).  In delineating the boundaries of the "implied false certification theory" of FCA liability, the Supreme Court made clear that a

contract is not itself a "claim." *Escobar*, 579 U.S. at 181-82.  The Hinsons do not allege that they investigated or reported Microwave's claims.  Indeed, they admit they know nothing about them.  *See* Complaint ¶ 159.

As Microwave argues, *see* Motion at 10-11; Reply at 2-3, the Hinsons' case aligns more closely with *United States ex rel. Goulden v. BAE Systems Information and Electronic Systems Integration, Inc.*, No. 11-12017-NMG, 2014 WL 3897645 (D. Mass. Aug. 7, 2014), in which the United States District Court for the District of Massachusetts held that an employee pressing an FCA retaliation claim had "failed to allege sufficient facts to support the conclusion that he was engaged in protected conduct as defined by the First Circuit" when he stated that he had "reported his concerns that [his employer] was *illegally manufacturing* machineguns in violation of federal ATF regulations" but "[a]t no point" alleged that he had "raised with his employer the issue of non-compliance with the subject contracts or false claims submitted pursuant to those contracts." *Goulden*, 2014 WL 3897645, at *9.[4]

In sum, even accepting as true all well-pleaded facts alleged in the Hinsons' complaint and drawing all reasonable inferences in their favor, they fall short of showing that they engaged in conduct protected by the FCA, failing to state a plausible claim for relief pursuant to their sole federal cause of action.[5]  I therefore recommend that the Court dismiss Count II with prejudice, decline to exercise

---

[4] *Goulden*, like *Manfield*, predates the Supreme Court's clarification in *Escobar* that the "implied false certification" theory of FCA liability focuses on representations made in claims for payment.  *Escobar*, 579 U.S. at 581.

[5] It does not appear, nor have the Hinsons suggested, that their Complaint can be amended to state such a claim.

supplemental jurisdiction over the state-law claims set forth in Count I, and dismiss Count I without prejudice.  *See IDEXX Lab'ys, Inc. v. Bilbrough*, No. 2:22-cv-00056-JDL, 2022 WL 1451525, at *2 (D. Me. May 9, 2022) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state law claims." (cleaned up)).

### III.  Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the Motion, **DISMISS** the Hinsons' FCA retaliation claim (Count II) with prejudice, **DECLINE** to exercise supplemental jurisdiction over the remaining state-law claims, and **DISMISS** those claims (Count I) without prejudice.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated: November 21, 2022

/s/Karen Frink Wolf
United States Magistrate Judge