**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **KATHLEEN HINSON and** | ) | |
| **BRENT HINSON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:22-cv-00114-JDL** |
| | ) | |
| **MICROWAVE TECHNIQUES,** | ) | |
| **LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

In their Complaint filed in this Court on April 25, 2022 (ECF No. 1), Plaintiffs Kathleen and Brent Hinson allege that their former employer, Microwave Techniques, LLC ("Microwave") terminated their employment because of their whistleblowing activities in violation of the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S.A. § 833 (West 2022), and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4633 (West 2022). The Hinsons further allege that Microwave violated the anti-retaliation provision in the False Claims Act ("FCA"), 31 U.S.C.A. § 3730(h) (West 2022), by retaliating against them because of their efforts to stop a violation of the FCA. Microwave has moved to dismiss the Complaint (ECF No. 8), contending that (1) the Hinsons have failed to state an FCA retaliation claim and (2) because the FCA retaliation claim is the only claim presenting a federal issue, the accompanying state law claims should be dismissed without prejudice.

United States Magistrate Judge Karen Frink Wolf filed her Recommended Decision (ECF No. 16) on November 21, 2022, pursuant to 28 U.S.C.A. § 636(b)(1)(B)

1

(West 2022) and Fed. R. Civ. P. 72(b).  The Magistrate Judge recommended that the Court dismiss the Hinsons' FCA retaliation claim for failure to state a claim and that the Court should decline to exercise supplemental jurisdiction over the state law claims in the absence of the FCA retaliation claim.  The Hinsons objected to the Recommended Decision on December 2, 2022 (ECF No. 17), and Microwave filed a Response to the Objection on December 16, 2022 (ECF No. 18).  I held a hearing on the Motion to Dismiss and the Recommended Decision on February 15, 2023 (ECF No. 20).

After reviewing and considering the Magistrate Judge's Recommended Decision, together with the entire record and the attorneys' arguments at the February 15, 2023, hearing, I have made a *de novo* determination of all matters adjudicated by the Magistrate Judge.  For the reasons explained below, I disagree with the Magistrate Judge's conclusions that the Hinsons have failed to state an FCA retaliation claim and that the Hinsons' state law claims should be dismissed.

## I.  BACKGROUND

### A.  Factual Background

The factual background is drawn from the well-pleaded allegations in the Complaint, which are treated as true when deciding a motion to dismiss, *Douglas v. Lalumiere,* No. 2:20-cv-00227-JDL, 2022 WL 860248, at *1 (D. Me. Mar. 23, 2022).

Microwave manufactures and develops radio frequency components, and it has contracts with the U.S. Government and other government contractors to produce radio frequency equipment that contains or is based on national security secrets.  One of the conditions of these contracts is that Microwave "represents and warrants to the

[G]overnment that it will manufacture and produce radio frequency equipment that contains and/or is based on national security secrets on premises with the necessary and required security clearance."  ECF No. 1 at 4, ¶ 29.  Microwave is paid by the Government for fulfilling its contracts.

Kathleen and Brent Hinson were employed as Radio Frequency Engineering Technicians in Microwave's Gorham facility.[1]  Although some individuals at that facility had security clearances, including the Hinsons and the Lab Manager, the facility itself did not have an Information System Security Clearance and was not accredited for classified testing of radio frequency equipment.  During the Hinsons' employment, Microwave was trying to get an Information System Security Clearance for the Gorham lab.  A separate Microwave facility in Nashua, New Hampshire, had the required security clearance.

In May 2020, Brent witnessed the Lab Manager testing radio frequency equipment on an "unclassified" analyzer in the Gorham facility, even though the testing involved secret frequencies whose disclosure to an enemy could threaten national security.  ECF No. 1 at 5, ¶ 44.  The testing was done out in the open, and people who did not have security clearances could see the testing and the secret frequencies.  This unsecure testing violated the terms and conditions of Microwave's contracts with the U.S. Government.  Upon the Hinsons' information and belief, Microwave never intended to comply with the contract terms requiring it to maintain

---

[1]  For some of the events at issue, Kathleen Hinson was employed as an Inventory Control Coordinator, but she later became a Radio Frequency Engineering Technician.

the proper security clearance at the premises where it manufactures and develops radio frequency equipment based on national security secrets.

Brent told the Lab Manager that the testing was "wrong and illegal." ECF No. 1 at 6, ¶ 59. Despite this warning, the Lab Manager continued to test units using secret frequencies at the Gorham facility. In June 2020, Brent reported the testing to the Facility Security Officer ("FSO"), who confirmed that Microwave's contracts require Microwave to comply with security protocols and protect the secrecy of the frequencies. The FSO asked Brent to "keep records about what [the Lab Manager] was doing that was illegal, how often, where, and who was around when he conducted the tests." ECF No. 1 at 7, ¶ 66. Brent subsequently kept in touch with the FSO about his concerns.

In July or August 2020, the Lab Manager asked Brent to participate in illegal testing and to stop reporting him to the FSOs. He repeated this request multiple times. Brent did not agree to perform the tests or to stop reporting the Lab Manager. As the FSO instructed, Brent "kept track" of the Lab Manager's illegal testing. ECF No. 1 at 8, ¶ 82. The Lab Manger then harassed the Hinsons, and Kathleen reported the harassment and illegal testing to Human Resources. The Vice President of Human Resources and Safety in Microwave's New Hampshire office told Kathleen that she knew that illegal testing could result in "serious legal action and the loss of orders." ECF No. 1 at 9, ¶ 91. Despite the Hinsons' reports, the Lab Manager continued to conduct what the Hinsons believed to be illegal tests and the Lab Manager put even less effort into protecting the secrecy of the frequencies.

The Hinsons also internally reported the testing to another FSO as well as Microwave's CEO.  The Hinsons also reported the testing to the FBI and repeatedly called the Department of Defense ("DOD") to report that Microwave was not doing anything to stop the illegal testing.  On March 3, 2021, they filed an online complaint with the DOD.  Agents from the FBI and NCIS eventually came to speak to the Hinsons at their home to get information about the alleged illegal testing.

As their reporting continued, the Lab Manager continued to harass the Hinsons.  In February 2021, the Hinsons were also issued "Employee Improvement Plans" that contained false allegations about their workplace conduct, even though, under Microwave's employee policy, the Hinsons should have been issued a verbal warning first.  ECF No. 1 at 9, ¶ 98.  The Hinsons told the Vice President of Human Resources that the Employee Improvement Plans were issued in retaliation for their reporting activities and that the Lab Manager continued to conduct illegal testing.  On March 17, 2021, the Hinsons received positive performance reviews.

On March 19, 2021, during a heated disagreement with the Hinsons, the Lab Manager told the Hinsons that he knew that they had reported him to the FBI and the DOD.  He also told the Plaintiffs to stop calling Human Resources and that Human Resources "was not going to protect [them]."  ECF No. 1 at 14, ¶ 133(b).  He told the Hinsons to leave the premises for the rest of the day.  After the argument, the Vice President of Human Resources advised the Hinsons to leave for the day.

The Vice President of Human Resources ultimately terminated the Hinsons on March 23, 2021.  During their termination meeting, the Hinsons were told that the new FSO and an owner of Microwave, both of whom knew about the Hinsons'

reporting, had made the decision to terminate their employment.  The Hinsons were also told that they could not go back into the Gorham facility because of the pending FBI investigation into the Lab Manager's alleged illegal testing.

## B.    Procedural History

On April 25, 2022, the Hinsons filed a two-count Complaint against Microwave (ECF No. 1).  Count I alleges a violation of the MHRA, 5 M.R.S.A. § 4633, and the MWPA, 26 M.R.S.A. § 833.[2]  Count II alleges a violation of the FCA's anti-retaliation provision, 31 U.S.C.A. § 3730(h).  In support of Count II, the Hinsons state they believe that Microwave "was defrauding the United States Government by billing and taking payment from the United States Government but failing to provide what was promised, namely compliance with the contractual requirements to protect classified frequencies."  ECF No. 1 at 18, ¶ 158.  The Hinsons admit that they could not "identify all of those false claims for payment that were caused by [Microwave's] conduct" because "[t]he false claims were presented by [Microwave's] employees and agents, and Plaintiffs do not have access to the records of all such false or fraudulent statements, records, or claims."  ECF No. 1 at 18, ¶ 159.

The Complaint averred two independent bases for federal subject-matter jurisdiction: (1) diversity of citizenship over all of the claims, *see* 28 U.S.C.A. § 1332 (West 2022), and (2) federal question jurisdiction over the FCA retaliation claim, with supplemental jurisdiction over the remaining state claims, *see* 28 U.S.C.A. §§ 1331, 1367 (West 2022).

---

[2]   The Hinsons previously received a Notice of Right to Sue from the Maine Human Rights Commission with respect to the claims in Count I.

On May 23, 2022, Microwave filed a Motion to Dismiss (ECF No. 8).  In the motion, Microwave argues that the Hinsons have failed to state an FCA retaliation claim because the Complaint fails to allege that the purported whistleblowing activities could reasonably have led to an FCA action.  According to Microwave, the Hinsons did not adequately plead that they had investigated a false claim for payment and their reporting of alleged illegal activity and contract violations were insufficient.  Microwave further argues that if the FCA claim is dismissed, the state law MWPA and MHRA claims should also be dismissed because there would no longer be any federal claim.  The Hinsons filed a Response in Opposition (ECF No. 10), and Microwave then filed a Reply (ECF No. 11).

The Motion to Dismiss was referred to Magistrate Judge Wolf, who held an oral argument and issued a Recommended Decision on November 21, 2022 (ECF No. 16).  The Magistrate Judge recommended that the Court grant the Motion to Dismiss, dismiss the FCA claim, and decline to exercise supplemental jurisdiction over the state law claims.  In reaching that conclusion, the Magistrate Judge agreed with Microwave that the Hinsons "do not forge a sufficient link between their conduct and the submission of any false claim to sustain their FCA retaliation action, warranting its dismissal."  ECF No. 16 at 8.  The Magistrate Judge noted that the Hinsons attempted to forge the necessary link by positing that unauthorized testing could form the basis for an FCA action under an "implied false certification" theory, which provides that the FCA may be violated when a defendant submits a claim for payment that makes representations about the goods or services provided but fails to disclose that a specific contractual requirement had not been complied with.  ECF No. 16 at

10.  The Magistrate Judge rejected this argument, noting that the Hinsons did not plead that they ever investigated or reported a claim for payment (or even a contract violation) and that the allegations underpinning their implied false certification theory were conclusory or described only their beliefs.  The Magistrate Judge also noted that contracts themselves cannot be FCA claims.  Therefore, the Magistrate Judge reasoned, the FCA retaliation claim should be dismissed, and the Court should decline to exercise supplemental jurisdiction over the state law claims because of the early stage of this case.

The Hinsons filed an Objection to the Recommended Decision (ECF No. 17), which raised a number of arguments, including: (1) the Magistrate Judge erroneously labeled some of their assertions conclusory or otherwise disregarded them; (2) the Complaint adequately alleged that they reported and investigated contract violations when they spoke with the FSO; (3) the Magistrate Judge erred in essentially requiring the Hinsons to have investigated fraud based on specific instances of false billing; (4) the Magistrate Judge erred in concluding that a contract is not a "claim" for purposes of the FCA and declining to apply a materiality-and-causation test to determine whether the alleged breach of contract could reasonably lead to an FCA action; and (5) even if a contract is not a claim, the contracts can constitute "record[s]" under 31 U.S.C.A. § 3729(a)(1)(B) (West 2022).  Microwave filed an Opposition to the Objection (ECF No. 18), resting primarily on the Magistrate Judge's finding that the Hinsons never investigated and could not identify any claims submitted by Microwave seeking payment for its services.

## II.  LEGAL ANALYSIS

### A.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *García-Catalán v. United States*, 734 F.3d 100, 102 (1st Cir. 2013) (quoting Fed. R. Civ. P. 8(a)(2)).  "At the pleading stage, the plaintiff need not demonstrate that she is likely to prevail, but her claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'"  *Id.* at 102-03 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To apply this standard, courts use a two-step approach: First, "the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  *Id.* at 103 (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)).  Second, "the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

### B.    The False Claims Act

#### 1.    FCA Overview

The FCA, "prohibits, in relevant part, any person from 'knowingly present[ing] or caus[ing] to be presented, a false or fraudulent claim' to the federal government." *Guilfoile v. Shields*, 913 F.3d 178, 187 (1st Cir. 2019) (alterations in original) (emphasis omitted) (quoting 31 U.S.C.A. § 3729(a)(1)(A)).  It also prohibits any person from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C.A. § 3729(a)(1)(B).  "[A]

'claim' . . . includes direct requests to the [g]overnment for payment as well as reimbursement requests made to the recipients of federal funds under federal benefit programs." *Guilfoile*, 913 F.3d at 187 (second and third alterations in original) (quoting *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 182 (2016)). The FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 225 (1st Cir. 2020) (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)), *abrogated on other grounds by Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008).

The FCA "authorize[s] private individuals to sue on behalf of the federal government and [is] intended to aid the government in discovering fraud and abuse 'by unleashing a posse of *ad hoc* deputies to uncover and prosecute frauds against the government.'" *Karvelas*, 360 F.3d at 224 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). Actions brought by such private parties "are traditionally known as 'qui tam' actions, and the persons who pursue them are known as 'relators.'" *Adams v. Penobscot Cmty. Health Care*, No. 1:17-cv-00229-LEW, 2019 WL 6138416, at *2 (D. Me. Nov. 19, 2019) (citation omitted) (quoting 31 U.S.C.A. § 3730(c)).

 "In addition to prohibiting the submission of false claims, the FCA bars an employer from retaliating against an employee 'because of lawful acts done . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of [the FCA].'" *Guilfoile*, 913 F.3d at 187 (alterations in original) (quoting 31 U.S.C.A. § 3730(h)(1)). "The pleading standards for actions directly alleging the submission of

false claims, such as qui tam actions[,] . . . and the pleading standards for actions alleging retaliation, differ in crucial ways." *Id.* at 188. Although a qui tam plaintiff must comply with the particularity requirements of Fed. R. Civ. P. 9(b) and "sufficiently plead facts supporting the existence of an actual false claim," an FCA retaliation plaintiff need only plead that "he or she was retaliated against based on 'conduct that reasonably could lead to a viable FCA action.'" *Id.* at 188 & n.10 (quoting *Karvelas*, 360 F.3d at 238). "Put colloquially, rather than plausibly pleading the existence of a fire—the actual submission of a false claim—a plaintiff alleging FCA retaliation need only plausibly plead a reasonable amount of smoke—conduct that could reasonably lead to an FCA action based on the submission of a false claim." *Id.* at 189.

A plaintiff can establish a prima facie case of FCA retaliation by showing "(i) that she engaged in protected conduct under the False Claims Act, (ii) that [the defendant] knew she engaged in such conduct, and (iii) that [the defendant] retaliated against her because of this conduct." *Lestage v. Coloplast Corp.*, 982 F.3d 37, 47 (1st Cir. 2020). The Defendants' Motion to Dismiss contends that the Hinsons' Complaint fails to state an FCA retaliation claim because it does not plead facts showing that the Hinsons engaged in protected conduct, the first element of their prima facie case. I therefore focus my analysis on that issue.[3]

---

[3] Microwave's motion does not address the second or third elements of the FCA retaliation test. *See Karvelas*, 360 F.3d at 237 n.22 (noting that the second and third elements of the test cannot be met if the first element is not met). Because Microwave has not developed an argument that it is entitled to dismissal on the second or third elements, I do not address them in this order. In any event, I conclude that the factual allegations in the Complaint are sufficient to show both that Microwave was aware of the Hinsons' conduct and that Microwave retaliated against the Hinsons because of this conduct. *See Lestage*, 982 F.3d at 47.

### 2.      Protected Conduct

"In order to satisfy the first element of a [retaliation] cause of action under 31 U.S.C. § 3730(h), a plaintiff must demonstrate that he or she engaged in activity protected under the FCA." *Karvelas*, 360 F.3d at 236. "This element of a retaliation claim does not require the plaintiff to have filed an FCA lawsuit or have developed a winning claim at the time of the alleged retaliation." *Id.* In fact, an employee "need not have *known* that his actions could lead to a qui tam suit under the FCA, or even that a False Claims Act existed, in order to demonstrate that he engaged in protected conduct." *Id.* Instead, conduct is protected when it involves "acts done . . . in furtherance of an FCA action," *id.* at 236 (alteration in original), or "other efforts to stop [one] or more violations" of the FCA, 31 U.S.C.A. § 3730(h)(1). The First Circuit has interpreted this standard to mean that "protected conduct" under the FCA is "limited to activities that 'reasonably could lead' to an FCA action; in other words, investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *U.S. ex rel. Booker v. Pfizer*, 847 F.3d 52, 59 (1st Cir. 2017) (quoting *Karvelas*, 360 F.3d at 237), *superseded in part by rule*, Fed. R. App. P. 3, *as recognized in Gonpo v. Sonam's Stonewalls & Art, LLC*, 41 F.4th 1, 9 (1st Cir. 2022). This accords with the statute's legislative history, which shows an intent to broadly define "protected activity." *See Karvelas,* 360 F.3d at 236-37.

### C.    Analysis

The Hinsons' Complaint asserts that the Hinsons investigated and reported both the alleged illegality of the Lab Manager's frequency testing and the fact that

such testing allegedly violated the terms of Microwave's government contracts. Standing alone, however, the Hinsons' reports of what they believed to be unlawful testing do not constitute protected conduct because the mere reporting of illegality or regulatory noncompliance does not constitute protected conduct. "Even at the motion to dismiss stage, FCA retaliation claims are subject to dismissal if the allegedly protected conduct amounts to mere efforts to ensure regulatory compliance, rather than the investigation and report of 'actual fraudulent conduct.'" *Adams*, 2019 WL 6138416, at \*3 (quoting *Booker*, 847 F.3d at 60); *Karvelas*, 360 F.3d at 237 (concluding that a hospital employee's internal reporting that the hospital was not meeting the regulatory requirements for Medicare and Medicaid reimbursement did not constitute protected activity); *U.S. ex rel. Goulden v. BAE Sys. Info. & Elec. Sys. Integration, Inc.*, No. 11-12017-NMG, 2014 WL 3897645, at \*9 (D. Mass. Aug. 7, 2014) (concluding that an employee's report that his employer was illegally manufacturing machine guns did not constitute protected conduct). The precise issue, then, is whether the Hinsons' reporting and investigation of violations of Microwave's contractual obligations constituted protected conduct.

As a preliminary point, I disagree with Microwave that the Hinsons "do not allege that . . . they either investigated or reported any issues concerning Microwave's contracts." ECF No. 18 at 5. To the contrary, the Complaint alleges that Brent discussed alleged contract violations with the FSO and that the FSO directed him to monitor the issue. This case is thus different from an unreported decision relied on by Microwave, *Goulden*, in which the plaintiff did not plead that he had ever "raised with his employer the issue of non-compliance with the subject contracts" and instead

only raised his belief that the employer's activities were unlawful.  2014 WL 3897645, at *9.

The salient question, therefore, is whether the Hinsons' investigation and reporting of possible government contract violations reasonably could lead to an FCA action.  "Entering into a contract with the federal government is not the same as presenting a claim for payment to the government."  *Chalifoux v. BAE Sys., Inc.*, No. 20-cv-401-PB, 2021 WL 54171, at *4 (D.N.H. Jan. 6, 2021).  This is where the "implied false certification theory" comes into play.  As the Supreme Court explained in *Escobar*, under the "implied false certification" theory of FCA liability, the FCA can be violated "when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement."  579 U.S. at 181.  In such circumstances, FCA "liability may attach if the omission renders those representations misleading."  *Id.*

Microwave argues that the Hinsons have not shown that their conduct could lead to an FCA action under the "implied certification theory" because the Hinsons "do not allege that they ever investigated or reported any billing or claims practices of Microwave."  ECF No. 18 at 5.  In fact, Microwave contends, the Hinsons admitted that they knew nothing about any false claims.

As explained earlier, FCA retaliation plaintiffs need not meet the same pleading requirements as FCA qui tam plaintiffs, who "must sufficiently plead facts supporting the existence of an actual false claim."  *Guilfoile*, 913 F.3d at 188 (quoting *Karvelas*, 360 F.3d at 236).  Thus, the Hinsons need not plead that they reported or

investigated actual false claims—instead, they must plead only that they engaged in conduct that could lead to an FCA action, such as investigations or reports that "concern the employer's knowing submission of false or fraudulent claims for payment to the government." *Karvelas*, 360 F.3d at 237.

Courts have repeatedly concluded that there need not be a direct investigation of a false claim to satisfy this standard. *See Jewell v. Lincare, Inc.*, 810 F. Supp. 2d 340, 344 (D. Me. 2011); *see also U.S. ex rel. Lokosky v. Acclarent, Inc.*, 270 F. Supp. 3d 526, 533 (D. Mass. 2017) (concluding that a plaintiff engaged in protected activity when she declined to sell a product she believed was misbranded and reported misbranding and off-label promotion of the product because "[t]he law does not require a plaintiff to connect all of the dots between alleged off-label promotions and fraud on the government"); *U.S. ex rel. Gobble v. Forest Lab'ys, Inc.*, 729 F. Supp. 2d 446, 450 (D. Mass. 2010) (concluding that there is no requirement that an "employee's subject conduct 'must, objectively, be focused on or directed or aimed at exposing fraud against the government'" and that the plaintiff's "complaint does generally describe how his inquiries support an FCA claim"). For example, in *Jewell*, the Court concluded that the plaintiff had stated an FCA retaliation claim by contending that he was fired after reporting the alleged forging of client signatures on documents that were later submitted to Medicare. 810 F. Supp. 2d at 344. The Court specifically rejected an argument along the lines of the one that Microwave makes here—that the plaintiff never reported "fraudulent billing practices." *Id.* at 343-44. Thus, the fact that the Hinsons investigated and reported contract violations, but not fraudulent claims for payment, does not render their Complaint deficient.

Of course, that is not to say that a plaintiff's investigation or reporting of a breach of a government contract necessarily constitutes protected conduct.  That would run afoul of the principle that the FCA "is not an 'all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 579 U.S. at 194 (citation omitted) (quoting *Allison Engine Co.,* 553 U.S. at 672).  But, as the First Circuit made clear in *Guilfoile*, 913 F.3d at 194-95, a plaintiff can successfully plead that they engaged in protected activity by investigating and reporting contract breaches if they show causation and materiality.

Specifically, in *Guilfoile*, the plaintiff argued that he was retaliated against because he was terminated after reporting that his employer was not complying with the terms of contracts with government-owned hospitals that required the plaintiff's employer to maintain a fully staffed 24/7 call center.  *Id.* at 184-85.  The Court rejected that argument, concluding that the plaintiff "ha[d] not sufficiently pleaded a connection between the 24/7 call center contractual terms and the submission of any claim."  *Id.* at 194.  The Court noted that "[i]n general, '[i]t is not the case that any breach of contract, or violation of regulations or law, or receipt of money from the government where one is not entitled to receive the money, automatically gives rise to a claim under the FCA.'"  *Id.* at 194-95 (second alteration in original) (quoting *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265 (9th Cir. 1996)).  Instead, "[e]ven in the FCA retaliation context, there must be a reasonable connection between the alleged conduct and the submission of claims within the purview of the FCA."  *Id.* at 195.  For a plaintiff to adequately plead such a connection, the First Circuit explained, "he or she must adequately plead causation and materiality."  *Id.* (citing *D'Agostino v. ev3,*

*Inc.*, 845 F.3d 1, 7-8 (1st Cir. 2016)).  The Court concluded that the plaintiff had failed to plead causation and materiality because he "ha[d] not pleaded any plausible connection between the alleged contractual breach and the submission of claims to the government, or how the contractual breach would have been material to the payment of any claims."  *Id.*

*Guilfoile* is the First Circuit's most recent pronouncement on the issue and controls my analysis.  Accordingly, whether the Hinsons have adequately pleaded that their investigation of a contract breach could reasonably lead to an FCA violation depends on whether they have adequately pleaded causation and materiality and not, as Microwave argues, whether they have pleaded that they specifically investigated claims for payment.

### 1. Causation

The causation requirement means that "the defendant's conduct must cause the government to make a payment or to forfeit money owed."  *D'Agostino*, 845 F.3d at 8.  In *Guilfoile*, the Court concluded that the causation requirement was not met because the plaintiff had "not pleaded any plausible connection between the alleged contractual breach and the submission of claims to the government."  913 F.3d at 195.

Here, Microwave argues that the Hinsons have not shown causation because they have failed to plead "a connection between the contractual terms regarding security in manufacturing and testing and the submission of any claim for payment by Microwave."   ECF No. 8 at 15.  Microwave also asserts that the Hinsons have failed to plead how the alleged contractual breach "actually related to . . . the payment of any claims that Microwave may or may not have made" and that "the Hinsons here

insomuch as admit they are unaware of any false claims."  ECF No. 8 at 15.  In response, the Hinsons argue that Microwave misapprehends the difference between qui tam claims and FCA retaliation claims, which do not require pleading the actual submission of a false claim, and that the Complaint adequately shows that Microwave's contract violations reasonably could lead to an FCA action based on the submission of a false claim.

Although it is close, I conclude that the Hinsons' Complaint adequately pleads causation.  The Complaint alleges that (1) Microwave receives payments from the U.S. Government pursuant to government contracts that require Microwave to produce its radio frequency equipment on premises that have the required security clearance; (2) Microwave breached these contracts by failing to produce radio frequency equipment at a facility with the proper security clearance; (3) Microwave represented that its radio frequency equipment was produced in compliance with its government contracts, when in fact it was not; and (4) the U.S. Government paid Microwave for its noncompliant products.[4]  Drawing all reasonable inferences in favor of the Hinsons as the nonmoving party, *see Genzyme Corp. v. Fed. Ins. Co.*, 622 F.3d 62, 68 (1st Cir. 2010), I conclude that the Complaint sufficiently pleads causation because it alleges facts supporting a "plausible connection between the alleged contractual breach and the submission of claims to the government," *Guilfoile*, 913 F.3d at 195.  Thus, this case is unlike *Chalifoux*, in which the plaintiff did not

---

[4]  I disagree with Microwave's contention that the Hinsons' Complaint contains only conclusory statements and their own beliefs in support of their FCA retaliation claim.  Although the Hinsons' Complaint does contain some statements that just recite legal conclusions, it contains enough additional well-pleaded factual assertions to state an FCA retaliation claim, including the required causation element.

"attempt[] to connect his complaints about [the defendant's] regulatory violations to the submission of fraudulent claims."  2021 WL 54171, at *4 & n.3  Although it is questionable whether the Hinsons' Complaint would have been sufficient to state an FCA qui tam claim, the allegations in the Complaint suffice here because "adequately pleading an FCA retaliation claim does not require adequately pleading the submission of a false claim."  *Guilfoile*, 913 F.3d at 189.

I am also unpersuaded by Microwave's argument that the Hinsons have failed to show causation because they admit in their Complaint that they "cannot identify all of the false claims for payment that were caused by Defendant's conduct."  ECF No. 1 at 18, ¶ 159.  To adequately plead an FCA retaliation claim, the Hinsons need not point to specific false claims; instead, they must show that they were retaliated against based on conduct that "reasonably could lead to a viable FCA action."  *Guilfoile*, 913 F.3d at 188 (quoting *Karvelas*, 360 F.3d at 236).  In other words, as the First Circuit put it, the Hinsons need not "plead[] the existence of a fire."  *Id.* at 189.  Instead, they need only "plausibly plead a reasonable amount of smoke."  *Id.*  I conclude that the Hinsons' Complaint alleges sufficient smoke to meet their burden to show causation at this preliminary stage.

### 2.  Materiality

In addition to causation, to show that they were investigating conduct that reasonably could lead to an FCA action, the Hinsons must also show materiality—that is, that "the contractual breach would have been material to the payment of any claims."  *Guilfoile*, 913 F.3d at 195; *see also D'Agostino*, 845 F.3d at 7 ("[T]he FCA requires that the fraudulent representation be material to the government's payment

decision itself."). "The falsity of a claim is 'material' if it has 'a natural tendency to influence or was capable of influencing the [government]'s decision' whether to pay or reimburse the claim." *Guilfoile*, 913 F.3d at 187 (alteration in original) (quoting *U.S. ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 307 (1st Cir. 2010)). To determine materiality, the court "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193 (alteration in original) (quoting 26 Richard A. Lord, Williston on Contracts § 69:12 (4th ed. 2003)). In this way, the key question is "whether a piece of information is sufficiently important to influence the behavior of the recipient." *U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir. 2016). The FCA materiality standard is "demanding." *Guilfoile*, 913 F.3d at 187 (quoting *Escobar*, 579 U.S. at 194).

"[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refused to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Escobar*, 579 U.S. at 194-95. Additionally, materiality "cannot be found where noncompliance is minor or insubstantial." *Id.* at 194.

Although it is again a close question, I conclude that the Complaint contains sufficient factual allegations to support a plausible inference of materiality for several reasons. First, the nature of the noncompliance here supports a reasonable inference of materiality. According to the Hinsons, Microwave contracts to produce frequencies that are based on national security secrets and its work involves secret frequencies whose disclosure could endanger national security. As confirmed by the FSO,

Microwave's government contracts include terms requiring Microwave to manufacture and produce radio frequency equipment containing national security secrets on premises with the required security clearance.  In light of the nature of Microwave's contracts, noncompliance with this term would not be "minor or insubstantial."  *Id.*  To the contrary, it is a reasonable inference that knowledge that this term of the contract had not been complied with would affect the U.S. Government's decision to pay for Microwave's services because the radio frequency equipment would not fulfill its intended secure uses if the secrecy of the frequencies had not been maintained.  *See U.S. ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110 (1st Cir. 2016) (noting that the "centrality" of certain requirements and the fact that those requirements "go 'to the very essence of the bargain'" are strong factors weighing in favor of materiality (quoting *Escobar*, 579 U.S. at 193 n.5)).

Second, the allegations in the Complaint regarding what happened after the Hinsons complained to the FBI and the DOD support an inference that Microwave's noncompliance was material.  The FBI and NCIS reached out to the Hinsons to investigate Microwave's conduct, and it can be reasonably inferred that the FBI undertook an investigation at Microwave's Gorham facility.  Drawing all reasonable inferences in the Hinsons' favor, I conclude that this evidence of the Government's "actual behavior" after it learned of the Lab Manager's testing supports the conclusion that the violation of this contract term was material.  *Escobar*, 579 U.S. at 193 (quoting 26 Williston on Contracts § 69:12).

Third, the nature of the interactions between Microwave's employees and the Hinsons supports a conclusion that Microwave's alleged noncompliance would have

been material.  The Lab Manager repeatedly told the Hinsons to stop reporting his testing.  Additionally, Microwave barred the Hinsons from returning to the Gorham facility during the FBI investigation.  Although these facts are not decisive, the attempts to stop the Hinsons from reporting the secret frequency testing and to stop the Hinsons from rendering assistance to the Government during its investigation support the inference that the alleged noncompliance was a serious matter that could affect Microwave's right to payment under its contracts with the Government.

In light of these factors, I conclude that the Hinsons have adequately pleaded materiality as required by *Guilfoile* and, consequently, have adequately pleaded that they engaged in protected conduct because their activities "reasonably could lead" to an FCA action under 31 U.S.C.A. § 3729(a)(1)(A).[5]  *Guilfoile*, 913 F.3d at 188, 195 (quoting *Karvelas*, 360 F.3d at 236).  Therefore, I conclude that Microwave's Motion to Dismiss must be denied as to Count II of the Hinsons' Complaint.

## D.    Motion to Dismiss MWPA and MHRA Claims

Because I conclude that the Hinsons have adequately stated an FCA retaliation claim, Microwave's argument that I should decline to exercise supplemental jurisdiction over the Hinsons' state law MWPA and MHRA claims in Count I is moot and I do not address it.[6]

---

[5]  The Hinsons also argue that their conduct could also reasonably have led to an FCA action under 31 U.S.C.A. § 3729(a)(1)(B), which prohibits any person from knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.  I do not address this alternative contention further, however, because (1) it is not necessary to do so given my conclusion that the Hinsons have stated an FCA retaliation claim and (2) it received little mention in the parties' briefing and arguments.

[6]  Along with federal question jurisdiction, the Hinsons' Complaint pled diversity jurisdiction under 28 U.S.C.A. § 1332 as an independent basis for subject-matter jurisdiction.  Neither party addressed whether the requirements of diversity jurisdiction are met in their memoranda filed before the

## III. CONCLUSION

For the reasons described above, the Recommended Decision of the Magistrate Judge (ECF No. 16) is rejected and Microwave's Motion to Dismiss (ECF No. 8) is **DENIED.**

**SO ORDERED.**

**Dated:  March 29, 2023**

_____/s/ JON D. LEVY_____
**CHIEF U.S. DISTRICT JUDGE**

---

Magistrate Judge or in their written submissions in connection with Hinsons' Objection to the Recommended Decision.